# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF GEORGIA
# SAVANNAH DIVISION

| | | |
|---|---|---|
| TIMOTHY LEE LANIGAN, | ) | |
| | ) | |
| v. | ) | CR418-258 |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

Defendant Timothy Lee Lanigan is charged with one count of possession of a firearm by a prohibited person, in violation of 18 U.S.C. § 922(g)(1).  Doc. 1 (Indictment); doc. 50 (Superseding Indictment).  He moves to suppress all evidence obtained during a stop and search on May 10, 2018.  Doc. 68.  The Government opposes.  Doc. 70.  On October 29, 2019, the Court held a hearing on defendant's motion.  For the following reasons, the motion should be **DENIED**.

## BACKGROUND

On May 10, 2018, during the course of a narcotics investigation, the Chatham County Narcotics Team ("CNT") and Garden City Police Department ("GCPD") executed a search warrant on the property at 1602 Dean Forest Road, Lot C44, in the Nassau Woods Mobile Home Community.  Doc 68 at 1; doc 70 at 2.  The community is accessed by a

single road with posted signs that denote it as "private property." Doc. 68 at 1. While other officers executed the warrant, Lieutenant Harley parked his vehicle near the entrance to watch for Norman Brown, an occupant of the property named in the warrant. Doc. 70 at 2. Officers knew that Brown would often ride with others. *Id.* During his surveillance, Lieutenant Harley observed a gold SUV, which was previously seen at the property being searched, and a silver Mercedes sedan enter the community. Doc. 68 at 2. The two vehicles were observed acting suspiciously—making abrupt stops and attempting to backout of the community. Doc. 70 at 3. An unusual degree of movement was also observed from the vehicle's occupants. *Id.* While Lieutenant Harley stopped the gold SUV, the silver Mercedes appeared to be avoiding the police presence. *Id.* Before Lieutenant Shawn Myers of the GCPD stopped the silver Mercedes, it "attempt[ed] to drive too fast for the space he was maneuvering through" and "came close to where Lieutenant Myers was standing." *Id.*

After stopping the vehicle, Lieutenant Myers observed that Lanigan, who was driving, had constricted pupils and bloodshot eyes. *Id.* Once the car stopped, officers recognized Brown in the back seat, drew

their weapons, and directed all three occupants to exit the car keeping their hands visible.  Doc. 68 at 2; doc. 70 at 3–4.  Lanigan attempted to exit the vehicle with his back to officers, after which he was handcuffed and searched.  Doc. 70 at 4.  During an initial questioning, he was unable or unwilling to coherently provide his name or identification.  *Id.*  When asked if he was carrying any weapons, he admitted that he had a knife.  *Id.* A search of his pockets produced the knife, but no identification.  *Id.*

During Lanigan's detention, Sherell Stevenson, a passenger in the vehicle, informed Lieutenant Harley that upon entering the community, Lanigan began to behave nervously and "said that he had a gun on him and that he could not be caught with it."  *Id.*  With defendant's consent, officers searched the vehicle and discovered .38 and .22 caliber bullets and unused plastic bags.[1]  *Id.*  Lieutenant Myers subsequently performed a second search of Lanigan, which produced a loaded .38 caliber revolver in the front waistband of his pants.  *Id.* at 4–5.  Officers subsequently determined Lanigan's identity and that he was a convicted felon serving a term on probation.  *Id.* at 5.

---

[1] Defendant suggests in his motion that there is dispute as to if consent was given to search the vehicle.  No argument or evidence was provided in support of this suggestion.

## ANALYSIS

Interactions between law enforcement and citizens generally fall into three categories: "(1) brief, consensual and non-coercive interactions that do not require Fourth Amendment scrutiny; (2) legitimate and restrained investigative stops short of arrests to which limited Fourth Amendment scrutiny is applied; and (3) technical arrests, full-blown searches or custodial detentions that lead to a stricter form of Fourth Amendment scrutiny." *United States v. Perkins*, 348 F.3d 965, 969 (11th Cir. 2003) (internal citations omitted).  Interactions of the second type require "reasonable suspicion" as articulated in *Terry v. Ohio*, 392 U.S. 1 (1968), and allow law enforcement to briefly detain, for investigative purposes, an individual that they reasonable suspect to be engaged in a criminal activity.  *See United States v. Hensley*, 469 U.S. 221, 229 (1985) ("[I]f police have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony, then a *Terry* stop may be made to investigate that suspicion.").  Reasonable suspicion is a lower standard than probable cause, *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000); "requir[ing] that the totality of the circumstances create, at least,

some minimal level of objective justification for the belief that the person engaged in unlawful conduct." *United States v. Blackman*, 66 F.3d 1572, 1576 (11th Cir. 1995). The third type of interactions, involving a more significant invasion of an individual's liberty, requires law enforcement to meet the higher standard of probable cause. *See Redd v. City of Enterprise*, 140 F.3d 1378, 1382 (11th Cir. 1998) ("It is clearly established that an arrest made without probable cause violates the Fourth Amendment."); *United States v. Robinson*, 414 U.S. 218, 237 (1973) ("A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment . . ."); *United States v. Magluta*, 418 F.3d 1166, 1182 (11th Cir. 2005) ("In most circumstances, for a search that is not based on consent to comply with the Fourth Amendment, law enforcement must obtain a warrant supported by probable cause.").

Both probable cause and reasonable suspicion are determined based on a totality of the circumstances and the collective knowledge of the officers involved. *United States v. Acosta*, 363 F.3d 1141, 1145 (11th Cir. 2004) (reasonable suspicion that defendant was engaged or was about to engage in a crime was based on a totality of the circumstances from the collective knowledge of the officers involved in the stop); *United*

States v. Pierre, 825 F.3d 1183, 1192 (11th Cir. 2016) (Probable cause is based on the "facts and circumstances within the collective knowledge of the law enforcement officials." (quoting United States v. Jimenez, 780 F.2d 975, 978 (11th Cir. 1986)); see also U.S. v. Cortez, 449 U.S. 411, 417–18 (1981) ("a particularized and objective basis for suspecting the particular person stopped of criminal activity" must be based on "the totality of the circumstances—the whole picture."). The involved officer's subjective motivations are immaterial to the Fourth Amendment; the Court is only concerned with "whether, given the circumstances, reasonable suspicion objectively existed." Hicks v. Moore, 422 F.3d 1246, 1252 (11th Cir. 2005); see also Whren v. United States, 517 U.S. 806, 813 (1996) (adopting a purely objective test for assessing the validity of a traffic stop). The stop and subsequent searches of Lanigan and his vehicle meet both the reasonable suspicion and probable cause standards.

## I.    The Lawfulness of the Stop

Law enforcement possessed both probable cause and reasonable suspicion to stop defendant's vehicle. A traffic stop requires probable cause to believe that a traffic violation occurred or reasonable suspicion

that the person stopped was engaged in illegal conduct.  *Heien v. North Carolina*, 574 U.S. 54, 61 (2014); *United States v. Harris*, 526 F.3d 1334, 1337 (11th Cir. 2008).

The government argues that officers had probable cause to stop the car based on the appearance that the tint of the Mercedes' windows violated O.C.G.A. § 40-8-73.1(b)(2).  At the hearing, Lieutenant Harley testified that he noticed the dark tinting of the windows as the vehicle passed him and entered the community roadway.  He testified that, as the car left the public road, he perceived the windows to be "too dark."[2] Defendant does not contest whether the tint of the windows was violative of statute; but, rather, contests the officers' authority to conduct the stop on a private roadway.  In doing so, he argues that O.C.G.A. § 40-6-3 limits officers' ability to enforce certain traffic provisions to public roadways. Doc. 68 at 3–4.  That interpretation overextends the reach of § 40-6-3, which, by its express terms and as interpreted by Georgia courts, applies only to Chapter 6 of Title 40.  *See Madden v. Georgia*, 555 S.E.2d 832,

---

[2] Lieutenant Harley was unable to provide the exact percentage of tint permitted by Georgia law; however, he was able to articulate his understanding that tint complying with the law would allow an observer to "see in some;" which was not possible when viewing the Mercedes from its side.

834 (Ga. Ct. App. 2001) (finding that § 40-6-3 was limited to Chapter 6 of Title 40).  It, therefore, does not limit officers' ability to enforce the Chapter 8 provision at issue here.

Even if the defendant's interpretation were persuasive, it would not preclude the officers from executing the stop in the private community, after they observed the vehicle traveling on a *public* roadway.[3] Lieutenant Harley's observation of the vehicle entering the community and having window tint that he believed to be unlawful provided sufficient probable cause for a stop.  *See Harris*, 526 F.3d at 1337–38 (an officer had probable cause for a stop after directly observing a vehicle fail to signal during a lane change).  Lieutenant Myers', who ultimately stopped the vehicle, concession that he would not normally execute a stop on private property for a window tint violation is not fatal, because

---

[3] The Government points to two cases, *United States v. Edmonds*, 611 F.2d 1386 (5th Cir. 1980) and *United States v. Gardner*, 2010 WL 1519357 (M.D. Fla., May 3, 2010), to support the proposition that law enforcement may investigate or stop on private property if it has a reputation as being open to the public. At the hearing, Lieutenant Myers testified to his belief that that the community had a reputation as being open to the public; however, no other evidence was offered on this point. As the community was marked with private property signs and a single egress/exit—implying that it does not operate as a cut through or shortcut between public roadways—the Court is skeptical of the suggested reputation. Despite the considerable attention paid by both parties, the characterization of the community roadway as public or private is not ultimately dispositive of this motion and the Court need not address the issue.

probable cause is based on the collective knowledge of those involved. *Pierre*, 825 F.3d at 1192.  As such, probable cause existed to conduct the stop.

Additionally, the Government argues that the officers had probable cause to stop the vehicle for reckless driving, O.C.G.A. § 40-6-390(a).  The Government's claims that defendant's vehicle was traveling too fast for the area and came within a few feet of hitting Lieutenant Myers would suggest probable cause for a reckless driving stop.  *See Canino v. State*, 725 S.E.2d 782, 786 (Ga. Ct. App. 2014) (a vehicle's high rate of speed through a parking lot and coming within "ten to fifteen feet of striking" officers were among the factors supporting probable cause).  The characterization of a roadway as public or private is not relevant for reckless driving, as the offence is expressly excluded from the limitations of § 40-6-3.  O.C.G.A. §40-6-3(a)(3) ("The provisions of this chapter relating to reckless driving . . . shall apply to vehicles operated upon highways and elsewhere throughout the state").  Regardless of the window-tint, therefore, officers had adequate probable cause for the stop.

Even if officers did not have probable cause to stop the car for traffic violations, they had sufficient reasonable suspicion to justify the stop.

Lieutenant Harley testified that his purpose in monitoring the entrance of the community was to watch for Brown, who had a pattern of riding with others. Once the Mercedes entered the community, officers observed it acting suspiciously, including making an abrupt stop, the occupants "bouncing" around, and attempting to back out of the community after entering. Lieutenant Harley characterized the behavior of the vehicle's occupants as "surprised" and "concerned." The Mercedes also appeared to be attempting to avoid the police presence. Apparent nervous and evasive behavior provides reasonable suspicion for a stop. *See Wardlow*, 528 U.S. at 124 ("Our cases have also recognized that nervous, evasive behavior is a pertinent factor in determining reasonable suspicion"); *United States v. Brignoni-Ponce*, 422 U.S. 873, 885 (1975) ("The driver's behavior may be relevant, as erratic driving or obvious attempts to evade officers can support a reasonable suspicion."); *Florida v. Rodriguez*, 469 U.S. 1, 6 (1984) (*per curiam*) (defendant's "strange movements in his attempt to evade the officers aroused further justifiable suspicion").

The behavior of the vehicle and its occupants must also be considered in light of the ongoing execution of the search warrant, the

belief that Brown might be in the area riding in someone else's vehicle, and the frequency of crime in the area. *See Wardlow*, 528 U.S. at 124 (officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation.); *see also United States v. Hunter*, 291 F.3d 1302, 1306 (11th Cir. 2002) ("[T]he reputation of an area for criminal activity may be considered when determining whether circumstances are 'sufficiently suspicious' to warrant further investigation."). Considering the totality of these circumstances, reasonable suspicion existed that the occupants of the Mercedes were connected to the criminal activity being investigated. The stop was, therefore, justified by independent grounds establishing *both* probable cause *and* reasonable suspicion.

## II. Initial Investigation

Officers did not violate the scope of a permissible traffic or investigatory stop by directing Lanigan and his passengers to exit his vehicle. Even when supported by probable cause or reasonable suspicion, a traffic stop is a seizure within the meaning of the Fourth Amendment. *Delaware v. Prouse*, 440 U.S. 648, 653 (1979). As it is a limited form of

seizure, traffic stops are more analogous to *Terry* stops—investigative detentions—than custodial arrests. *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984). Incident to such seizures, courts have routinely authorized police to remove occupants from their vehicles. *See Pennsylvania v. Mimms*, 434 U.S. 106, 111 n. 6 (1977) ("[O]nce a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures."). As Brown was suspected of a drug offense, which often involve guns, officers had their weapons drawn as the vehicle was vacated. *See United States v. Pantoja-Soo*, 768 F.2d 1235, 1236 (11th Cir. 1985) (a stop is not automatically converted into an arrest when officers pull weapons for their safety); *United States v. Gibbs*, 917 F.3d 1289, 1294 (11th Cir. 2019) (where officers have a legitimate concern for their safety, drawing weapons is not inconsistent with *Terry*.")

After Lanigan exited his vehicle, Lieutenant Myers asked Lanigan for his name and if he had a weapon. *See Muhler v. Mena*, 544 U.S. 93, 101 (2005) (police do not require reasonable suspicion to ask a suspect for basic information, such as their name or to see their identification).

When Lanigan confessed to possessing a knife, Lieutenant Myers conducted a limited search of his pockets for the weapon. *See Arizona v. Johnson*, 555 U.S. 323, 327 (2009) ("To justify a patdown of the driver or a passenger during a traffic stop . . . the police must harbor reasonable suspicion that the person subjected to the frisk is armed and dangerous."). These actions did not exceed that permissible during a *Terry* stop.

## III.   Search of Vehicle

The vehicle search that produced the ammunition was proper as it was based on probable cause and consent. The Government's suggestion that the search was covered by the search warrant, however, is unavailing. By its terms, the search warrant covered "the residence and curtilage associated with 1602 Dean Forest Road Lot C44, Garden City Georgia 31406." Though the warrant permitted officers to search vehicles found within the curtilage of the property, *United States v. Armstrong*, 546 F. App'x. 936, 939 (11th Cir. 2013), a vehicle located away from the property, especially one not listed in the warrant, was beyond

the authorization's bounds.[4]  *See Walter v. United States*, 447 U.S. 649,

656 (1980) ("When an official search is properly authorized—whether by

consent or by the issuance of a valid warrant—the scope of the search is

limited by the terms of its authorization").  Officers would have been able

to stop and detain the vehicle if it were leaving the searched property, in

order to prevent the removal of evidence, but such authority would not

extend over the entire community.  *See United States v. Sears*, 139 F.

App'x. 162, 165–66 (11th Cir. 2005) (officers stopped departing occupant

within 100 feet of property to be searched); *see also Bailey v. United

States*, 568 U.S. 186, 199 (2013) ("The categorical authority to detain

incident to the execution of a search warrant must be limited to the

immediate vicinity of the premises to be searched.").  Additionally,

Brown's identification in the warrant among the "property, items,

articles, [and] instruments to be search for and seized" does not authorize

his search or seizure away from the specified property.  *See* 2 Wayne R.

LaFave, SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT §

4.9(a) (5th ed. 2019) ("There is no inherent defect in a single warrant

---

[4] Based on the Government's Exhibit 1-A, the Court estimates that the stop occurred less than half of a mile from the site of the search warrant.

authorizing search of a place and also a person, and thus a search of the named person when he is found at the place (or after he has departed therefrom) will be a valid search under the warrant, . . ..." (internal citations omitted)).

Despite the limitations of the warrant, Officers did have probable cause to search the vehicle.  Under the automobile exception, officers may conduct a warrantless search of a vehicle where there is probable cause to believe that it contains contraband or evidence.  *California v. Acevedo*, 500 U.S. 565, 580 (1991); *see also United States v. Delva*, 922 F. 3d 1228, 1243 (11th Cir. 2019) ("Under the automobile exception to the warrant requirement, the police may search an automobile and the containers within it where they have probable cause to believe contraband or evidence is contained." (internal quotes omitted)).   At the time of searching the vehicle, Lieutenants Harley and Myers had probable cause to believe that it might contain a weapon or other contraband, based on Brown's presence, Stevenson's statement, the suspicious way Lanigan exited the vehicle, his apparent intoxication, and the officer's experience with suspects in drug offences—who often possess weapons.  *See United States v. Tamari*, 454 F.3d 1259, 1261–62 (11th Cir. 2006) (Probable

cause to conduct a warrantless search is based on a totality of the circumstances known to the officers).

Even if probable cause did not exist, Lanigan consented to the search. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) (a search conducted pursuant to valid consent is an exception to the Fourth Amendment's warrant requirement); *United States v. Garcia*, 890 F.2d 355, 360 (11th Cir. 1989) (noting that voluntary consent to a search is a well-established exception to the Fourth Amendment's probable cause and warrant requirements).  In his motion and counsel's questioning at hearing, Lanigan hinted that consent was not given to search the vehicle; however, defendant has failed to provide any support for this contention. Regardless, the burden falls on the Government to demonstrate that valid consent was provided.  *United States v. Spivey*, 861 F.3d 1207, 1220 (11th Cir. 2017).  The Government has met this burden.

Though not the owner of the vehicle, Lanigan had the authority to consent to the search.  *See United States v. Geboyan*, 367 F. App'x. 99, 101 (11th Cir. 2010) ("As the driver, [defendant] could consent to a search of the car."); *United States. v. Dunkley*, 911 F.2d 522, 526 (11th Cir. 1990) ("[A] third party in sole possession and control of a vehicle

clearly has the authority to consent to its search."). Prior to the search, Lieutenant Harley correctly advised Lanigan of this authority. Consent was also offered voluntarily. *See Schneckloth*, 412 U.S. at 249 ("when the subject of a search is not in custody and the State attempts to justify a search on the basis of his consent, the Fourth and Fourteenth Amendments require that it demonstrate that the consent was in fact voluntarily given, and not the result of duress or coercion, express or implied."). Neither Lanigan's detention nor Lieutenant Harley's statement that, if consent was not proffered, drug sniffing dogs would be brought to the vehicle were sufficiently coercive to undercut voluntariness. *See United States v. Telly*, 362 F. App'x. 83, 86–87 (11th Cir. 2010) (consent to search was voluntary despite defendant being handcuffed); *United States v. Long*, 866 F.2d 402, 405 (11th Cir. 1989) (officers' statement that they would "dig up the place" if defendant did not consent to search of his yard was not coercion); *United States v. Garcia*, 890 F.2d 355, 361 (11th Cir. 1989) (officers advising that they would return with a warrant if unconditional consent was not provided was not coercion). The body camera recording proffered by the Government shows Lieutenant Harley requesting Lanigan's consent and

explaining what would occur if consent was not given.   This was reiterated during Lieutenant Lanigan's testimony at hearing. Defendant has offered no facts against the Government's position.    There is, therefore, nothing to suggest that Lanigan's consent was anything other than voluntary.  As the vehicle search was supported by probable cause and consent, it was appropriate.

## IV.   Search of Lanigan's Person

As there was reasonable suspicion that Lanigan was in possession of a weapon, a search his person for weapons was also permissible.  *Terry v. Ohio*, 392 U.S. 1, 27 (1968) (In conducting a *Terry* stop, an officer may search for weapons on the person "where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for the crime."); *see also United States v. Griffin*, 696 F.3d 1354, 1359 (11th Cir. 2012) ("Once an officer has stopped an individual, he may conduct a pat-down or frisk for weapons if he reasonably believes that his safety, or the safety of others, is threatened.").  Considering Lanigan's suspicious body positioning as he exited the vehicle, his apparent intoxication, Stevenson's statement, and the discovered ammunition, officers

reasonably believed that a gun might be on his person and he might pose a threat. *See United States v. Hunter*, 291 F.3d 1302, 1306 (11th Cir. 2002) (An officer may conduct a search for weapons if "a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." (quoting *Terry*, 392 U.S. at 27.)). In fact, the totality of the circumstances would also meet the higher probable cause threshold. That Lanigan was handcuffed and unable to reach the weapon at the time of the search did not eliminate the potential threat to officers. *See United States v. Rainone*, 586 F.2d 1132, 1134–35 (7th Cir. 1978), cert. denied, 440 U.S. 980 (1979) (though a suspect may not have immediate access to a weapon, a risk exists because of the possibility that the suspect may break away or regain access). As officers had probable cause to believe that Lanigan might be in possession of a weapon and a potential threat, the second search of his person was proper.

## CONCLUSION

In summary, law enforcement conducted a valid traffic stop based on probable cause that a traffic violation had occurred or a valid investigatory stop based on reasonable suspicion that the occupants of

the vehicle were connected to criminal activity.  Law enforcement's initial investigation was conducted in a manner that was consistent with a traffic stop or a *Terry* stop.  The subsequent search of Lanigan and his vehicle were based on probable cause that developed during the investigatory stop and Lanigan's consent.   Accordingly, Lanigan's suppression motion should be **DENIED**.  Doc. 68.

This Report and Recommendation (R&R) is submitted to the district judge assigned to this action, pursuant to 28 U.S.C. § 636(b)(1)(B) and this Court's Local Rule 72.3.  Within 14 days of service, any party may file written objections to the R&R with the Court and serve a copy on all parties.  The document should be captioned "Objections to Magistrate Judge's Report and Recommendations."  Any request for additional time to file objections should be filed with the Clerk for consideration by the assigned district judge.

After the objections period has ended, the Clerk shall submit this R&R together with any objections to the assigned district judge.  The district judge will review the magistrate judge's findings and recommendations pursuant to 28 U.S.C. § 636(b)(1)(C).  The parties are advised that failure to timely file objections will result in the waiver of

rights on appeal.  11th Cir. R. 3-1; *see Symonette v. V.A. Leasing Corp.*, 648 F. App'x 787, 790 (11th Cir. 2016); *Mitchell v. United States*, 612 F. App'x 542, 545 (11th Cir. 2015).

**SO ORDERED AND REPORTED AND RECOMMENDED**, this 25th day of November, 2019.

_____

CHRISTOPHER L. RAY
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA